BOISE CASCADE CORPORATION,
Plaintiff–Appellee,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 01–36086.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 10, 2003.

Filed May 20, 2003.

Edward T. Pereluter and Richard Farber, Tax Division, United States Department of Justice, Washington, D.C., attorneys for the appellant.

William L. Goldman and Christopher Kliefoth, McDermott, Will & Emery, Washington D.C. and William R. VanHole, Boise, Idaho, attorneys for the appellee.

Before D.W. NELSON, THOMAS, Circuit Judges, and PREGERSON, District Judge.*

## OPINION

THOMAS, Circuit Judge.

This appeal presents the question of whether payments made by Boise Cascade Corporation ("Boise Cascade") to redeem stock held by its Employee Stock Ownership Plan are deductible as dividends paid pursuant to 26 U.S.C. § 404(k). We conclude, under the circumstances presented by this case, that they are and affirm the judgment of the district court.

* The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

## I

Boise Cascade is an integrated forest products and office products company headquartered in Boise, Idaho. It maintained the Boise Cascade Corporation Savings and Supplemental Retirement Plan ("Plan") for its employees. Effective May 25, 1989, the Plan was amended to add an employee stock ownership plan ("ESOP") component. A trust was established to hold and invest assets accumulated under the Plan. On July 10, 1989, in order to further the inclusion of the ESOP portion of the Plan, the Boise Cascade Board of Directors adopted a resolution creating a new series of convertible preferred stock consisting of 6,745,347 shares. Under the terms of the Certificate of Designation, the convertible preferred stock could only be issued to the Trustee of the fund; if the stock were transferred to any person other than the Trustee, the stock so transferred would convert automatically into shares of Boise Cascade common stock. On the same day the stock was created, July 10, 1989, the Trustee purchased all 6,745,347 shares of the convertible preferred stock from Boise Cascade for an aggregate purchase price of $303,540,615 ($45 per share). In order to finance the purchase of the convertible preferred stock, the Trustee borrowed $295,000,000 from various institutional investors, and $8,541,000 from Boise Cascade.

Upon a Plan Participant's termination of employment for any reason, convertible preferred stock equal in value to the Participant's vested account balance in the ESOP fund was redeemed, regardless of any election by the Participant with respect to the disposition of the vested account balance. At Boise Cascade's election, redemption payments could be made

in either cash or in Common Stock; all redemption payments in 1989 were in cash. Following termination of employment, the Participant could make elections with respect to the disposition of his or her vested account balances, including the ESOP fund. If the total of the Participant's vested account balance was $3,500 or less, the entire amount of vested account balances was distributed to the Participant. If the Participant's total of vested balances exceeded that amount, the Participant could elect: (1) to receive distribution of the entire amount of vested balances, including the vested amount in the ESOP fund; (2) to defer distribution of the entire amount, including his or her vested amount in the ESOP fund; or (3) to receive distribution of his or her vested account balance in the ESOP fund and defer distribution of the vested account balances in the other Investment Funds.

During 1989, Participants with vested account balances totaling 507.336 shares of convertible preferred stock terminated employment with Boise Cascade; accordingly, 507.336 shares of convertible preferred stock were presented by the Trustee to Boise Cascade for redemption. Of the cash paid for the redemption of the stock, most but not all was distributed to Participants who elected a distribution of either cash or common stock. The Participants received a Form 1099 for these amounts. For those amounts for which Participants elected to make a fund-to-fund transfer rather than receive a distribution, no Form 1099 was issued and Boise does not claim a deduction for these amounts.

On December 12, 1989, the Boise Cascade Board of Directors declared a dividend on the convertible preferred stock payable December 28, 1989. On December 28, 1989 a dividend of $11,192,244.47 was paid to the Trustee and applied to repay the ESOP loans in accordance with the terms of the Plan. Pursuant to 26 U.S.C. § 404(k), Boise Cascade claimed a deduction on its 1989 Federal income tax return for the entire amount of the December 28, 1989, Dividend. The IRS has allowed the deduction.

On November 18, 1996, Boise Cascade filed an amended Federal income tax return claiming a refund of Federal income taxes for 1989 in the amount of $1,724 plus allowable interest. Boise Cascade agrees that this refund should be reduced to $840 plus the amount of interest allowed by law. The claimed refund relates to convertible preferred stock redeemed by Boise Cascade due to employee terminations. Boise Cascade only claims a refund for those amounts paid that were actually distributed to Participants. By letter dated March 17, 1997, the IRS disallowed the refund.

 On July 11, 1997, Boise Cascade filed an action against the United States in the United States District court in Idaho, claiming entitlement to a refund pursuant to 26 U.S.C. § 404(k) for payments paid in redemption of stock due to employee terminations. On December 16, 1997, the case was referred to Magistrate Judge Larry M. Boyle. Upon cross-motions for summary judgment, on November 24, 1998, Magistrate Judge Boyle concluded that Boise Cascade was entitled to a refund and recommended that its motion for summary judgment should be granted. After considering further briefing by the parties, the district court found that the Magistrate Judge's report accurately set forth the facts and correctly applied the governing legal standards. The court agreed with the Magistrate Judge that the redemptions qualified as dividends under 26 U.S.C. § 302(b) and were therefore deductible under § 404(k). The court further found that Boise Cascade's deduction was not barred by § 162(k)(1) of the Code—the subject of the supplemental

briefing submitted when the case was re-opened. Accordingly, the district court adopted the Report and Recommendation of the Magistrate Judge as the decision of the district court and granted Boise Cascade's motion for summary judgment. This timely appeal follows. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review a grant of summary judgment de novo. *See Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir.2002). We also review a district court's interpretation of the tax code and corresponding treasury regulations de novo. *See Boeing Co. v. United States,* 258 F.3d 958, 962–63 (9th Cir.2001).

## II

Generally, dividends paid by a corporation to its share-holders are not deductible by the corporation for federal income tax purposes. *See* 26 U.S.C. § 311. However, 26 U.S.C. § 404(k) allows a corporation to deduct, for regular income tax purposes, the amount of certain dividends paid by the corporation to an employee stock ownership plan. A deduction is permitted if the dividend is (1) paid in cash to the plan participants or their beneficiaries; (2) paid to the plan and distributed in cash to participants or their beneficiaries not later than ninety days after the close of the plan year in which 6678 paid; or (3) used to make payments on a loan, the proceeds of which were used to acquire stock held by the ESOP.

Specifically, 26 U.S.C. § 404(k) provides as follows:

> (k) *Dividends Paid deductions.* In addition to the deductions provided under subsection (a), there shall be allowed as a deduction to a corporation the amount of any dividend paid in cash by such corporation with respect to the stock of such corporation if
>
> (1) such stock is held on the record date for the dividend by ... an employee stock ownership plan ... and (2) in accordance with plan provisions
>
> \* \* \* \* \* \*
>
> (B) the dividend is paid in cash to the plan and is distributed in cash to participants in the plan or their beneficiaries not later than 90 days after the close of the plan year in which paid.

The district court correctly concluded that the payments made by Boise Cascade were dividends pursuant to 26 U.S.C. § 404(k). There is no dispute that the payments made by Boise Cascade were paid to the Plan and then distributed to Participants during 1989. The amounts paid were distributed out of current or accumulated earnings and profits as required for the definition of "dividend" under 26 U.S.C. § 316(a). Section 316(a) further provides:

> To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which Section 301 applies, such distribution shall be treated as a distribution of property for the purposes of this subsection.

Thus, if the distributions to the employees were a distribution under § 301[1], then they were a "dividend" for the purposes of § 316 and the deduction provided for in § 404(k) applies.

Section 302 governs distributions in redemption of stock. Pursuant to 26 U.S.C. § 302(d), a redemption of stock shall be treated as a distribution of property to which § 301 applies unless § 302(a) applies. If § 302(a) applies, then the dis-

---

**1.** 26 U.S.C. § 301 provides that a distribution of property made by a corporation to a shareholder with respect to its stock will be included in gross income to the extent that the portion distributed was a dividend.

tribution will be treated as a part or full payment in exchange for stock rather than a distribution of property. In turn, § 302(b) sets out four circumstances in which redemptions will be treated as exchanges, rather than dividends. Both parties agree that the only possible applicable circumstance is that set out in § 302(b)(1): a redemption that "is not essentially equivalent to a dividend" will be treated as an exchange.[2]

In *United States v. Davis*, 397 U.S. 301, 313, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970), the Supreme Court established that § 301(b)(1) only applies when the redemption results "in a meaningful reduction of the shareholder's proportionate interest in the corporation." Here, the parties have stipulated that for the purposes of § 302(b), if the Trust is treated as the owner of the convertible preferred stock that was redeemed in 1989, then the redemptions did not result in a meaningful reduction in the Trust's proportionate interest in Boise Cascade. However, the parties also agree that if the Participants are treated as the owners then the redemptions did result in a meaningful reduction in the Participants' interests in the corporation.

In short, the question of whether the distributions to Participants in this case are deductible dividends under § 404(k) depends on whether the Trust or the Participants owned the convertible preferred stock when the redemptions took place. The district court correctly concluded that the Trust, not the Participants, owned the stock when it was redeemed. Therefore, the deduction under § 404(k) was appropriate.

Section 302(c)(1) provides that "section 318(a) shall apply in determining owner-ship of stock for purposes of this section." In turn, 26 U.S.C. § 318(a)(B)(i) provides:

> Stock owned, directly or indirectly, by or for a trust (other than an employees' trust described in section 401(a) which is exempt from tax under section 501(a)) shall be considered as owned by its beneficiaries in proportion to the actuarial interest of such beneficiaries in such trust.

Both parties agree that the ESOP Plan qualifies as a profit sharing plan under § 401(a). Therefore, the plain meaning of § 318 demonstrates that, unlike stock owned by other trusts, stock owned by a § 401(a) employees' trust is not considered owned by its beneficiaries.

The government's primary argument is that the Participants were the beneficial owners because they had the right to instruct the Trustee as to the manner in which to vote their share of the convertible preferred stock and the right to instruct the Trustee as to how to respond to tender or exchange offers for the stock. However, 26 U.S.C. § 671 belies this assertion. It provides that no person may be treated as the owner of a trust based solely on the amount of dominion or control that person exercises over the trust. Specifically, § 671 holds in relevant part as follows:

> Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in

---

**2.** The other circumstances are: § 302(b)(2), Substantially disproportionate redemption of stock; § 302(b)(3) Termination of sharehold-er's interest; and § 302(b)(4) Redemption from noncorporate shareholder in partial liquidation.

computing taxable income or credits against the tax of an individual.... No items of a trust shall be included in computing taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust.

There is nothing unique in the factual setting of this case that would compel a contrary conclusion. The Trust held legal title at the time of the redemption. The Trustee had the right to sell or convert the convertible preferred stock, to attend Boise Cascade shareholder meetings, to nominate directors to the Boise Cascade Board of Directors, to inspect Boise Cascade's corporate records, to vote the stock, to receive the dividends paid with respect to the convertible preferred stock, to use those dividends for the benefit of the Trust, to reinvest the dividends paid, to direct the investment of the assets in the Trust, and to receive any liquidation proceeds paid by Boise Cascade with respect to the convertible preferred stock. In contrast, the Participants had none of these rights. In fact the Participants had extremely limited rights. The Participants had no right to terminate the Trustee; their remedy was to bring a suit for breach of fiduciary duty. Boise Cascade, not the Participants, had the right to name a Trustee. Indeed, the record indicates that the Trustee had on at least one occasion overridden Participant instructions concerning a tender offer when the Trustee determined that following the instructions would violate ERISA.

Under the terms of the certificate of designation for the convertible preferred stock, such stock could only be issued to the Trustee. In the event that the convertible preferred stock was transferred to any person other than the Trustee, the stock so transferred would automatically convert into shares of Boise Cascade common stock. Therefore, it was literally impossible for the Participants to own the convertible preferred stock. *Cf. Comm'r v. First Sec. Bank,* 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972) (IRS could not attribute income to corporation which could not legally receive that income). Further, the Participants did not pay tax on the Trust income until the payments were distributed to them; they did not pay tax when the stock was redeemed.

Under the applicable statute as applied to the undisputed facts, it is clear that the Trustee, not the Participants, owned the convertible preferred stock when the redemption occurred. Thus, a deduction under § 404(k) was appropriate.

### III

■ The district court also correctly concluded that 26 U.S.C. § 162(k) does not bar the deduction for the payments. This subsection is an exception to the general rule that permits a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. 162(a). In order to qualify for a deduction under section 162(a), an expenditure must be: 1) ordinary, 2) necessary, 3) an expense, 4) paid or incurred during the taxable year, and 5) attributed to the carrying on of the taxpayer's trade or business. *Comm'r v. Lincoln Sav. & Loan Ass'n,* 403 U.S. 345, 352, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). The expenses referenced in § 162 are usual and ordinary expenses, not capital expenditures which are generally amortized over the useful life of the asset.

■ Section 162(k) prohibits deductions claimed as a consequence of a stock redemption. Thus, it acts as a disallowance provision for otherwise allowable noncapital deductions incurred in connection with a stock redemption transaction. In general, § 162(k) was enacted to "clarify

that all expenditures by a corporation incurred in purchasing its own stock ... are nonamortizable capital expenditures." H.R.Rep. No. 426, 99th Cong., 2d Sess. 248 (1986); S.Rep. No. 313, 99th Cong., 2d Sess. 222 (1986); *see also* H.R. Conf. Rep. No. 841, 99th Cong., 2d Sess. 168 (1986). Specifically, § 162(k) provides that:

> Except as provided in paragraph (2), no deduction otherwise allowable shall be allowed under this chapter for any amount paid or incurred by a corporation in connection with the redemption of its stock.

For our purposes, the key question is whether the distributions to the Participants were payments made "in connection with" the redemption of the convertible preferred stock. The government would have us construe this in the broadest possible sense, to capture within its net any expenses associated with the transaction, however remote. However, the legislative history of § 162(k) cautions against the approach. Indeed, the legislative history indicates a narrower construction, noting that certain transactions which are only "proximate in time or arising out of the same general circumstances" as the redemption are not circumscribed by the "in connection with" language. We eschewed the government's broad theory in *In re Kroy*, 27 F.3d 367 (9th Cir.1994), foreclosing the government's argument concerning the nexus between the distributions and the redemptions of stock used to finance those distributions. In *Kroy*, the taxpayer had borrowed funds in order to execute a leveraged buyout; the borrowed funds were then used to repurchase the taxpayer's stock. The taxpayer sought to deduct the loan fees it had paid in order to acquire the necessary funds. *Id.* at 368. As here, the government argued that the "plain meaning of the statute" prevented the taxpayer from taking the deduction because the fees were incurred "in connec-

tion with" the repurchase of the stock. *Id.* at 369. We rejected this argument, holding instead that the borrowing of the funds was a separate and independent transaction, even though the loan proceeds were used to redeem the stock. *Id.*

In so doing, we applied the "origin of the claim test" established by *United States v. Gilmore*, 372 U.S. 39, 49, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963), which held that the deductible quality of an expense stemmed from the "origin and character" of the expense incurred, rather than its potential consequences upon the taxpayer's fortunes.

The legislative history supports this construction. The Conference Report which accompanied § 162(k) in the Tax Reform Act of 1986 clarifies the legislative intent as follows:

> [W]hile the phrase "in connection with a redemption" is intended to be construed broadly, the provision is not intended to deny a deduction for otherwise deductible amounts paid in a transaction that has no nexus with the redemption other than being proximate in time and arising out of the same general circumstances. For example, if a corporation redeems a departing employee's stock and makes a payment to the employee in discharge of the corporation's obligations under an employment contract, the payment in discharge of the contractual obligation is not subject to disallowance under this provision.

H.R. Conf. Rep. 99–841, 1986 U.S.C.C.A.N. 4075, 4256–57.

Here, we are confronted with two segregable transactions: the stock redemption by Boise Cascade and subsequent distributions to the Plan Participants by the Trustee. The two are not ineluctably linked. In fact, the transactions were entirely separate.

First, although the Plan provided that redemption of the convertible preferred stock was required upon employment termination, distribution of the amount redeemed did not automatically occur. Indeed, if the Participant had a vested Plan account greater than $3,500, the Participant could defer distribution of the account balance. The record indicates that there were Participants who so chose in 1989.

Second, the redemption of the convertible preferred stock was not a prerequisite to the Trustee's duty to make distributions under the terms of the Plan. The Plan allowed the Participant to defer distribution until death, disability or retirement under certain circumstances unrelated to the act of stock redemption. The Participant also had certain rights to control whether the distribution was to be made in a lump sum, or in time payments. Thus, the terms of the Plan make it plain that the triggering event for the Trustee's duty to distribute payments is the election of the Participant, not the redemption of the stock.

The government also attempts to set up a false dichotomy between Boise Cascade's position and the "plain language" of the statute. It argues that if § 162(k)'s disallowance were not to apply to transactions of this type, then the statute would have limited it to "amounts paid by a corporation to redeem its stock," rather than amounts paid "in connection" with the redemption of the stock. However, the legislative history explains why the alternative language proposed by the government would be too narrow for the purposes of the statute:

> The Act denies a deduction for any amount paid or incurred by a corporation in connection with the redemption of its stock. Congress intended that amounts subject to this provision will include amounts paid to repurchase stock; premiums paid for the stock; legal, accounting, brokerage, transfer agent, appraisal and similar fees incurred in connection with the repurchase; and any other expenditure that is necessary or incident to the repurchase, whether representing costs incurred by the purchasing corporation or by the selling shareholder (and paid or reimbursed by the purchasing corporation), or incurred by persons or entities related to either.

General Explanation of the Tax Reform Act of 1986, H.R. 3838, 99th Cong., Pub.L. No. 99–514, at 278 (1987). Thus, the disallowance for payments "in connection with" the redemption of stock captures fees and other expenditures "necessary and incident" to repurchase which would otherwise be deductible business expenses. Yet as the language of the Plan makes clear, the distributions to the employees are a separate obligation from the corporation's obligation to the Trust to redeem the convertible preferred stock and thus are not "necessary or incident" to the redemption in the manner contemplated by the statute.

## IV

In sum, the payments made by Boise Cascade to redeem stock held by its employee stock ownership plan are deductible as dividends paid pursuant to 26 U.S.C. § 404(k), and the deduction is not precluded by 26 U.S.C. § 162(k). We need not reach any of the alternative arguments urged by the parties.

**AFFIRMED.**